DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**DEREK WARREN LOGUE,**
Appellant,

v.

**LAUREN FRANCES BOOK,**
Appellee.

No. 4D18-1112

[August 14, 2019]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Michael G. Kaplan, Judge; L.T. Case No. DVCE17-5746.

Gary S. Edinger of Benjamin, Aaronson, Edinger & Patanzo, P.A., Gainesville and James S. Benjamin of Benjamin, Aaronson, Edinger & Patanzo, P.A., Fort Lauderdale, for appellant.

J. David Bogenschutz and Jaclyn E. Broudy of J. David Bogenschutz & Associates, P.A., Fort Lauderdale, for appellee.

PER CURIAM.

The appellant appeals a final injunction for protection against stalking. He argues, among other things, that the trial court erred in entering the injunction because the appellee failed to prove the statutory requirements for an injunction and because the injunction is a prior restraint on his free speech. We agree in part and reverse.

The appellee is a public advocate for child abuse victims and promotes strict policies related to sex offenders. The appellant is an outspoken opponent of sex offender laws.[1] The appellee filed for an injunction alleging the appellant was harassing and cyberstalking her. The trial court held a hearing and took testimony from the parties and witnesses, after which the court entered the injunction. The injunction is now appealed.

---

[1] In 2001, an Alabama court convicted the appellant of improper relations with a minor.

"A trial court has broad discretion to grant an injunction, and we review an order imposing a permanent injunction for a clear abuse of that discretion." *Pickett v. Copeland*, 236 So. 3d 1142, 1143-44 (Fla. 1st DCA 2018).

In support of her request for an injunction, the appellee alleged three instances of offending conduct: (1) the appellant's protest at the end of a children's march in Tallahassee; (2) his appearance and conduct at a New York film festival; and (3) his social media postings on his website, blog, and other social media platforms.

At the injunction hearing, the appellee testified about these three instances. She expressed her fear of the appellant and testified to her contact with law enforcement to ensure her safety and that of her young children.

*The First Instance – The Tallahassee Protest*

Testimony revealed the appellant protested, and encouraged others to join his protest, against the children's march in Tallahassee. He stood at the side of the road, across the street from the State Capitol, holding a three-by-three-foot handwritten sign protesting the appellee's advocacy of sex offender registration laws. His protest included a diorama of a homeless camp and a commode chair bearing the title, "King Ron's Throne."[2] Law enforcement had been notified of the protest in advance, and there were no untoward incidents reported regarding appellant's conduct.

*The Second Instance – The Film Festival*

The appellee was scheduled to attend a film festival in New York for the screening of a documentary about sex offenders in which both she and the appellant appeared. She knew the appellant would attend the film festival and arranged for security to be in place. The appellant sat three rows behind her during the documentary.

When the documentary concluded, the appellee walked to the front of the theater to take questions. When the appellant took the microphone, he asked the appellee: "how can you sit there and talk about how people on the registry don't deserve a second chance when your father . . . is a convicted criminal and he got a second chance?" A law enforcement officer in attendance testified that the appellant asked the question in a loud,

---

[2] A reference to the appellee's father.

aggressive manner and pointed his finger at the appellee as he asked it. However, other witnesses also said the appellant never left his seat in the theatre before he asked this question, nor did he attempt to approach the appellee at any time.

The appellee responded. She was then immediately escorted away from the stage by security, and the microphone was taken from the appellant.

*The Third Instance – The Website and Social Media*

Testimony and evidence established the appellant maintained a website and other profiles on social media platforms professing his opposition to sex offender legislation. The appellant posted the appellee's home address and pictures of her home on his website. On his other social media platforms, the appellant also posted a video of a song containing an obscene title and lyrics, as well as a cartoon depicting a tombstone with an obscene reference to the appellee.[3] He "tweeted" that the song perfectly depicted the appellee. However, the appellant neither directly communicated with the appellee about these posts, nor sent them to her or any of her associates by email, text, or otherwise.

*Other Testimony at the Hearing*

Law enforcement testified that it viewed the appellant as a credible threat to the appellee and described steps undertaken to ensure her safety. The FBI investigated the appellant while local and state law enforcement provided security for the appellee. The investigation revealed the appellant's Alabama conviction and a domestic violence injunction.

Although he did not evaluate the appellant, a psychologist testified, over the appellant's objection, to the factors used to assess risk.

> So if you have all those factors together, someone with an agenda, somebody who affiliates with others with that same agenda, somebody who increases their approach, somebody who's angry or has angry outbursts, somebody who announces their intentions in terms of what they're going to do, all of those things together can significantly increase an individual's risk potential.

---

[3] A secretary for the appellee's father also testified to an anonymous phone message she received indicating that the appellee and her father were in danger.

The trial court granted the petition and issued the injunction. The court ordered the appellant to have no contact with the appellee directly, through a third party or:

> anyone connected with [appellee's] employment or school to inquire about [appellee] or to send any messages to [appellee]. The [appellant] shall not publish any statement threatening the [appellee]. It also ordered that [appellant] could not go to, in, or within 500 feet of the [appellee]'s residence or place of employment; 100 feet of the [appellee]'s vehicle; or 1,000 feet of the [appellee].

On appeal, the appellant argues the trial court erred in issuing the injunction for three statutorily-required reasons. First, he argues his actions serve a legitimate purpose in advocating against restrictive legislation adversely affecting sex offenders. Second, he claims that his social media activities do not constitute "a course of conduct directed at a specific person" as required by section 784.0485, Florida Statutes (2016). And third, the appellant asserts that the appellee's subjective fear does not satisfy the objective "reasonable person" standard required by the statute.

The appellee claims that: the appellant's actions are threats that serve no legitimate purpose; the appellant's actions were "directed" at her; his postings threaten her safety; her fear is reasonable because the appellant is a convicted child molester and has had a domestic violence injunction previously issued against him; his actions have placed her and her children in fear for their safety by advertising her home address; and, the trial court properly entered the injunction.

"Section 784.0485 . . . allows an injunction against stalking, including cyberstalking." *David v. Textor*, 189 So. 3d 871, 874 (Fla. 4th DCA 2016). "A person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person commits the offense of stalking . . . ." § 784.048(2), Fla. Stat. (2016).

> "Harass," in turn, "means to engage in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose." . . . [T]o be entitled to an injunction for stalking, the petitioner must allege and prove two separate instances of stalking. "Each incident of stalking must be proven by competent, substantial evidence to support an injunction against stalking." When considering the sufficiency of the evidence, "[c]ourts apply a reasonable person standard, not a

4

subjective standard, to determine whether an incident causes substantial emotional distress."

*David v. Schack*, 192 So. 3d 625, 627-28 (Fla. 4th DCA 2016) (citations omitted).

### A. *"Conduct That Serves No Legitimate Purpose"*

The appellant's Tallahassee protest was by all accounts peaceful—even if unpleasant in its scope and message. Each party is a vocal advocate for opposite positions on sex offender laws. This is an issue currently debated within what Justice Oliver Wendell Holmes once described as the "free trade in ideas." *Abrams v. U.S.*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). True, one side of this debate has far greater public support than the other, but that does not make the appellant's advocacy illegitimate.

As John Stuart Mill wrote, "even if the world is in the right, it is always probable that dissentients have something worth hearing to say for themselves, and that truth would lose something by their silence." JOHN STUART MILL, ON LIBERTY (1859), *reprinted in* ON LIBERTY AND OTHER ESSAYS 54 (John Gray ed., 1998). In short, the appellant's protest served a legitimate purpose even as objectionable as it may be.

### B. *"A Course of Conduct Directed at a Specific Person"*

There is no doubt that the appellant's posts were aimed at the appellee. However, our court and the Second and Third Districts have interpreted "a course of conduct directed at a specific person" to exempt social media messages from qualifying as the type of conduct covered by section 784.0485, Florida Statutes. *See Textor*, 189 So. 3d at 875; *Horowitz v. Horowitz*, 160 So. 3d 530, 531 (Fla. 2d DCA 2015) (reversing injunction because posts were not directed at a specific person); *Chevaldina v. R.K./FL Mgmt., Inc.*, 133 So. 3d 1086, 1092 (Fla. 3d DCA 2014) (reversing injunction against cyberstalking for internet posts).

In *Horowitz*, the trial court entered an injunction for protection against domestic violence to protect an estranged wife from her husband. 160 So. 3d at 530–31. She alleged the husband posted the lyrics to a song she had recently listened to in the privacy of her home. *Id.* at 531. The second post contained private messages between the wife and a third party via her personal Facebook account. *Id.* She alleged these posts made her fearful that the husband "either 'hacked' her computer or was somehow spying on her[.]" *Id.*

The Second District held the Facebook posts did not meet the statutory definition of cyberstalking because the posts were "not directed at a specific person." *Id.* "Unlike email communication, . . . posts to one's own Facebook page are not directed at a specific person but are instead posted for all of the user's Facebook 'friends' to see, depending on the user's privacy settings." *Id.* The appellant's social media postings similarly failed to meet the statutory definition of cyberstalking.

The Third District has aptly recognized that:

> [a]ngry social media postings are now common. Jilted lovers, jilted tenants, and attention-seeking bloggers spew their anger into fiber-optic cables and cyberspace. But analytically, and legally, these rants are essentially the electronic successors of the pre-blog, solo complainant holding a poster on a public sidewalk in front of an auto dealer that proclaimed, "DON'T BUY HERE! ONLY LEMONS FROM THESE CROOKS!"

*Chevaldina*, 133 So. 3d at 1092.

Here, not only were the posts not directly transmitted to the appellee, but the photo of her home and her street address were publicly-accessible in relation to the political action committee she ran at the same residence. Although the posts understandably caused the appellee concern, they were not "directed at a specific person" as defined by caselaw. *See Textor,* 189 So. 3d at 875.

The song and video, although vulgar and distasteful, were posted on various social media platforms and were not sent directly to the appellee in any form. "[W]here comments are made on an electronic medium to be read by others, they cannot be said to be directed to a particular person." *Id.*

The cartoon was also not sent directly or otherwise to the appellee, but appeared on the appellant's social media accounts. While the cartoon was an intense expression of ill-will toward the appellee, it did not satisfy the statute's requirement that it be directed to a specific person. *See id.*

C. *The Objective Reasonable Person Standard*

The appellee pleaded and proved that she was in fear of the appellant due to his actions, but her subjective fear cannot be the basis for the injunction's issuance. "Courts apply a reasonable person standard, not a

subjective standard, to determine whether an incident causes substantial emotional distress." *Schack*, 192 So. 3d at 628 (citations omitted). However, we need not make this determination because the Tallahassee protest, the appellant's attendance at the film festival, and the social media posts did not satisfy the statute's requirements to support the injunction.

D. *Conclusion*

We live in times where violence occurs all too frequently and an ordinary day may turn into a horrific tragedy. So, it is necessary for courts to be vigilant in reviewing petitions such as the one filed in this case. Notwithstanding that vigilance, courts must also adhere to the Constitution and the laws enacted by our legislature.

As the U.S. Supreme Court has stated:

> [O]ne of the costs of the First Amendment is that it protects the speech we detest as well as the speech we embrace. Though few might find respondent's statements anything but contemptible, his right to make those statements is protected by the Constitution's guarantee of freedom of speech and expression.

*U.S. v. Alvarez*, 567 U.S. 709, 729–30 (2012).

Florida case law has mandated that threats via social media be directed to the individual—not by content, but by delivery—to fall within the purview of section 784.0485. *See Textor*, 189 So. 3d at 875. The First Amendment guarantees freedom of speech and expression, even if distasteful and vulgar. Although the appellant's position may be socially abhorrent, he has a First Amendment right to express his views. While we understand and appreciate the appellee's fear, the First Amendment protects the appellant's despicable speech and his right to make it. For this reason, we must reverse the injunction.[4]

---

[4] The appellant also argues the injunction was a prior restraint on his free speech. We need not reach this issue because it is moot due to our reversal of the injunction. We do acknowledge the unique issue raised by the distance from which the appellant was ordered to stay away from the appellee's place of employment. Here, that employment includes Florida's Capitol Building, which effectively denied him access to a key means of political and constitutional expression—the ability to petition Florida's government officials. *See Frandsen v. Dep't of Envtl. Prot.*, 829 So. 2d 267, 269 (Fla. 1st DCA 2002).

*Reversed.*

MAY and KLINGENSMITH, JJ., concur.
MAY, J., concurs specially with opinion.
CIKLIN, J., dissents without opinion.

MAY, J., specially concurring.

I concur with the majority because Florida's statutory scheme and case law dictates the outcome. I write to express my concern that in the day and age in which we live social media postings, such as those involved here, have led people to lash out and wreak havoc on our children, families, friends, and communities.

Recently, a man was arrested for sending pipe bombs to a number of legislators allegedly as a result of social media encouragement. Indeed, international terrorists have been radicalized through social media. And, our elections have now fallen prey to manipulated social media.

Perhaps thought should be given to whether the law should provide some protection for those at which social media directs its attention, and others are motivated to act; such as, the circumstances pleaded and proven by the appellee in this case.

\*     \*     \*

***Not final until disposition of timely filed motion for rehearing.***